## IN THE UNITED STATES DISCTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1)    TYRESE DREW, | ) | |
| | ) | |
|          Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:   CIV-23-286-JAR |
| | ) | |
| (1) CORECIVIC, INC., a foreign | ) | |
| for-profit business corporation, | ) | |
| | ) | |
| | ) | |
| And | ) | |
| | ) | |
| (2) JAMES YATES, in his official and | ) | Jury Trial Demanded |
| individual capacities | ) | Attorney Lien Claimed |
| | ) | |
| And | ) | |
| | ) | |
| (3) DEFENDANTS DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW, Plaintiff, Tyrese Drew ("Plaintiff"), and for her causes of action against the above-named Defendants, alleges and states the following:

### THE PARTIES

1. Plaintiff is a citizen of Oklahoma County, Oklahoma.

2. CoreCivic, Inc. is a foreign for-profit organization that did contract with the Oklahoma Department of Corrections to operate a private prison, including at all relevant times, Davis Correctional Facility ("DCF"). DCF is a prison located in Holdenville, Hughes County, Oklahoma.

3. James Yates ("Warden") is a CoreCivic employee and the Warden of DCF. Upon information and belief, Mr. Yates is a resident of Hughes County, Oklahoma.

4. Defendants John Does 1-10 are detention and medical staff whose identities are unknown to Plaintiff at this time but whose acts are described below. It is believed that these individuals can be identified through the discovery process.

## NON-PARTY ACTORS

5. At all relevant times, Alexander Barrett was an inmate at DCF. He was convicted of Arson and Assault & Battery with Intent to Kill. Court records note that he had a need for anger management and had some gang involvement. He had been under DOC supervision since 2011 and in custody since 2015. He has not been charged with any crime related to his actions against Drew to date.

6. At all relevant times, Gabe Wainscott was an inmate at DCF. He was convicted of kidnapping and First-Degree Murder as well as Assault & Battery on a police officer. He had been in DOC custody since 2017. He has not been charged with any crime related to his actions against Drew to date.

7. A female correctional officer, last name Scott, was involved in this incident as described below. On information and belief, Scott's first name is Jessica.

## JURISDICTION AND VENUE

8. The jurisdiction of this Court is involved pursuant to 28 U.S.C. § 1343 to redress deprivations of rights secured by the Eighth and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons' civil rights and the redress of deprivation of those rights under color of law.

9. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve controversy arising under the Constitution and laws of the united States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

10. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS
### The incident giving rise to this lawsuit.

11. Drew was convicted in May 2019 of several crimes resulting in concurrent sentences, the longest of which was 8 years.

12. Drew is transgender, born male.  She is 6 foot tall and approximately 176 pounds and feminine in presentation. She arrived in the Department of Corrections' custody one week after her 20th birthday.

13. She was initially housed at Lawton Correctional Facility. During this time, Drew experienced violence from other inmates because of her gender presentation. Drew was housed in protective custody, at times, for her protection.

14. On or around June 19, 2021, Drew was transferred to Davis Correctional Facility. Upon her arrival, she expressed concerns for her safety given that she is a transgender woman in a male correctional facility.

15. While at DCF, Drew was threatened by other inmates.  Among other threats, Drew was asked by Mr. Barrett and Mr. Wainscott to participate in drug transfers inside the prison but Drew refused. Drew asked for protection from the facility but was often left unprotected, seemingly on purpose, by some of the guards.

Drew was so fearful that she asked to be placed in solitary confinement for her own protection.

16. On February 7, 2022, around 9:30 a.m., Correctional Officer Scott put Drew in a self-contained fenced area (called a "cage") for outside time ("rec"). It was cold outside and Drew requested a blanket.  Correctional Officer Scott left the area and did not return for at least one hour. No other correctional officer was in visible range of Drew or the others in their cages.

17. On information and belief, Correctional Officer Scott and Inmate Wainscott had an unusually close relationship. It is believed that Scott's actions were intended to facilitate Wainscott's desire to cause harm to Drew.

18. While Drew was contained within her cage, Inmates Barrett and Wainscott were able to use what appeared to be garden clippers to break the wires on the top of the fenced area above Drew and drop into her cage.

19. On information and belief, a prison employee provided the clippers to Inmates Barrett and Wainscott.

20. While the inmates were on the wires above her, Drew was yelling for help. But no one, including any correctional officers, responded to Drew's screams.

21. Once inside Drew's cage, these inmates were able to physically assault Drew until she was unconscious and had extensive damage to her face, head, and other parts of her body.

22. Drew was so harmed by this conduct that she was taken by ambulance to meet a medi-flight helicopter for transport to OU Medical Center, a Level 1 Trauma Center. The Air Evac record states:

"Per ground EMS, states patient was assaulted with "part of a fence" at approximately 9:30 am. Ground EMS says they were not dispatched until 10:30 am. States that prison guards called as soon as patient was found, states patient was last seen at 9:30 this morning. Upon their arrival, states that patient was unconscious and unresponsive. Ground crew elected to intubate the patient."

23. The guards on duty in this area, including but not necessarily limited to Correctional Officer Scott, either allowed this conduct or were so grossly negligent that no one was supervising, for an hour, known dangerous inmates near a younger, slight of build inmate who had already experienced violence and harassment due to her gender orientation and had voiced safety concerns about her safety.

24. Drew's family was not notified of her condition until two days later on February 9, 2022, and then only by a family member of another inmate.

25. Drew remained in a coma for an extended period of time. Despite being comatose, Drew was shackled to her bed.

26. Drew was moved to Lindsey Memorial Hospital for continued care. She received treatment for severe traumatic brain injury with severe cognitive and neurological impairment and left-sided paralysis, chronic left shoulder dislocation and other ailments.

27. According to medical records, Drew was in a "persistent vegetative state" for approximately 225 days. On August 31, 2022, doctors noted that "he will never recover to a meaningful state" and "will be with us likely until he expired, I do not believe he will survive this hospitalization." On September 2, 2022, Drew was able to squeeze with her right hand but unable to move her other limbs. On September 8, 2022, the ethics committee at Lindsay met and decided to make her

DNR/DNI.  Then, on September 11, 2002, Drew began crying during her wound care. On September 12,  2022, Drew opened her eyes.

28. Drew is now at Northwind Living Center where she requires round the clock care. She cannot bathe, eat, use the toilet or transport herself without medical devices or the assistance of another person. While Drew may continue to improve, it is anticipated that she will never be returned to the state of health she was in when she was admitted into the Department of Corrections care.

29. The Department of Corrections paroled Drew  on October 24, 2022, due to her medical condition and stopped paying for her necessary medical care.

### History of violence at CoreCivic Oklahoma facilities, including Davis Correctional Facility.

30. DCF is owned and operated by Defendant CoreCivic, which is the nation's leading private corrections company.[1] Announced this month, DCF will become a state-run prison in what the Oklahoma Department of Corrections is calling a cost-saving move.[2]

31. CoreCivic was founded in 1983 and currently houses approximately 90,000 inmates in its more than 65 facilities nationwide.[3] It generated $1.9 billion in revenue in 2021.[4]

32. Up until 2016, CoreCivic was known as Corrections Corporation of America.  It has been widely reported that CoreCivic changed its name in an effort to combat

---

[1] https://corecivic.com/about
[2] https://kfor.com/news/local/davis-correctional-facility-operations-move-forward-under-odoc/
[3] https://en.wikipedia.org/wiki/CoreCivic
[4] https://investigate.afsc.org/company/corecivic

mounting criticism for its woefully inadequate prisons that led to deplorable conditions for its inmates.

33. Unfortunately, the name change has not improved the safety of CoreCivic facilities.

34. CoreCivic previously ran several prisons in Oklahoma.

35. Diamondback, which was constructed in 1998, was closed in 2010 after losing a federal contract to house prisoners. Diamondback was plagued by a myriad of issues related to inadequate treatment and supervisions of prisoners. Notable examples include inmate riots that broke out in 1999 (twice)[5], 2004 and 2014.

36. Likewise, North Fork, also constructed in 1998, closed in 2015.[6]  It experienced similar problems including riots in 2000 (twice) and 2011.[7] Shortly after, an inmate was found dead in his cell from homicide in 2014,[8] Oklahoma ended its contract with North Fork.

37. DCF is currently the **<u>only</u>** prison owned and operated by CoreCivic in Oklahoma and has been open since 1996.

38. DCF is a 1600-bed, medium/maximum security prison for men.

39. Between August 2014 and September 2022, at least nine inmates have been murdered by other inmates at DCF far in excess of the national average which is 4 out of 100,000 inmates.[9]

---

[5] https://www.prisonlegalnews.org/news/1999/dec/15/riots-rock-cca-prison-in-oklahoma/
[6] https://oklahoma.gov/content/dam/ok/en/doc/documents/agency-information/fact-sheets/nfcc_facts.pdf
[7] https://en.wikipedia.org/wiki/North_Fork_Correctional_Facility
[8] *Id.*
[9] https://bjs.ojp.gov/content/pub/pdf/shsplj.pdf

40. In August 2014, inmate Lewis Hamilton was stabbed to death at DCF in an assault involving four other prisoners.  Upon information and belief, Hamilton and  inmate Silas Royal engaged in a physical altercation using makeshift weapons generally referred to as "shanks".[10]

41. Upon information and belief, it was widely known by other inmates and guards that Hamilton intended to assault Royal because he believed Royal had stolen his contraband cell phone. DCF guards observed Royal and Hamilton attacking each other yet failed to meaningfully intervene. Hamilton ultimately succumbed to his injuries, including stab wounds from Royal's shank.

42. On October 26, 2014, inmate Joshua Wheeler strangled his cellmate, 22-year-old inmate Tory Czernecki, to death in their cell. Wheeler had previously been convicted of felony assault and battery on a detention officer in Payne County in 2011. Prison guards saw Wheeler strangling Czernecki with an extension cord but did not enter the cell until approximately 11 minutes later, allegedly because Wheeler had jammed the cell door with crushed magnets. Czernecki was dead by the time the guards entered the cell. Wheeler was convicted of first-degree murder.[11]

43. Just five weeks later, on December 2, 2014, Douglas Monroe Cecil strangled his cellmate, Eric Grimm, to death in their cell.[12] At the time, Cecil was facing

---

[10] https://www.newson6.com/story/5e361d9a2f69d76f62043015/tulsa-inmate-accused-in-stabbing-death-at-holdenville-prison

[11] *See, State v. Price,* CF-2014-216, Hughes County District Court. *See also*, https://www.mcalesternews.com/news/trio-of-homicides-at-holdenville-prison/article_40f5699a-42bf-11e5-8041-97193b89c481.html

[12] *See*, https://www.mcalesternews.com/news/trio-of-homicides-at-holdenville-prison/article_40f5699a-42bf-11e5-8041-97193b89c481.html

another first-degree murder charge for allegedly stabbing an inmate to death in 2005 at the Oklahoma State Reformatory. Cecil, who ultimately pleaded guilty to murdering Grimm, allegedly told guards at DCF not to put Grimm in Cecil's cell shortly before the murder. Cecil openly disliked Grimm and had broken Grimm's arm at DCF approximately a year before the murder.  Upon information and belief, DCF employees failed to review the DOC reports detailing Cecil's previous assault on Grimm before placing Grimm in Cecil's cell. Grimm was moved into Cecil's cell from a segregated housing unit.  ("SHU") cell on November 13, 2014, where he had been housed due to having been assaulted by another inmate. Upon information and belief,  DCF guards failed to conduct and log their required site checks on Grimm and Cecil's cell in the hours leading up to the murder.

44. On April 12, 2015, inmate Bryan Blackburn, who suffered from multiple mental illnesses, was bludgeoned to death in his cell by his cellmate.[13] Blackburn's cellmate repeatedly beat Blackburn with a plastic food tray. Upon information and relief, Blackburn's cellmate assaulted him over a period of 15-20 minutes and the assault was very loud. Upon information and belief, other inmates attempted to get a Prison guard to respond to the assault, but the guard ignored them and kept talking on the phone. There is also evidence that the guard heard the sounds of the assault for over 15 minutes before deciding to investigate, but by that time, it was too late for Blackburn.

---

[13] https://www.poncacitynow.com/inmate-bludgeoned-to-death-in-private-prison/

45. Further, there is evidence that Blackburn's cellmate was high on "bath salts" at the time of the murder. DCF has long had a major problem with illegal narcotics being smuggled into the facility, leading to widespread drug use which has at times caused violence and overdoses. In fact, Plaintiff's two assailants were apparently involved in drug use and/or the drug trade inside DCF.

46. Another DCF inmate, Rico Thomas, was murdered by his cellmate, Brian LeShore, in the early morning hours of July 20, 2017.[14] Mr. Thomas was not discovered by CoreCivic guards until several hours after this death due to the guards failing to conduct regular site checks.

47. Mr. Thomas was a particularly vulnerable inmate due to suffering from severe mental health issues, including schizophrenia, that went completely untreated at DCF. Mr. Thomas had been assaulted by cellmates in the months before he was murdered. Yet DCF still placed Mr. Thomas in a cell with the violent LeShore, who killed Mr. Thomas shortly after the two were housed together.

48. In June 2019, Rossco Craig was a 22-year-old inmate at DCF with intellectual disabilities and mental illness. He had been injured by other inmates at DCF on multiple occasions prior to this time.

49. Despite this history, DCF housed Mr. Craig with Trevohn Price who had a lengthy disciplinary history of misconduct, including multiple incidents of assaultive behavior.

---

[14] *See*, *State v LeShore*, CF-2018-11, Hughes County District Court.  *See also*, *Simmons as Special Administratrix of the Estate of Rico Thomas* v. Corecivic et al., 19-CV-234-SPS, United States District Court, Eastern District of Oklahoma.

50. Predictably, Mr. Price began beating Mr. Craig. Although Mr. Craig cried out for help, no one from DCF assisted him. Ultimately, Mr. Craig died of blunt force trauma of the head due to Mr. Price's assault.[15]

51. Mr. Craig was not provided with medical attention for over two hours.

52. A report by Oklahoma Watch, dated September 22, 2022, states that 18 people at DCF were stabbed severely enough to warrant transport out of the facility in that year, including three who died. Of the three, two were inmates and one was a guard.[16]

53. One month after Drew was assaulted at DCF, on March 24, 2022, a 29-year-old DCF inmate was fatally stabbed in the neck.[17]

54. Two months after that, on May 31, 2022, another DCF inmate was fatally stabbed, this time in the abdomen.[18]

55. On July 31, 2022, correctional officer Alan Hershberger was fatally knifed by a DCF inmate.[19]

---

[15] *See*, *State v Price*, CF-2019-122, Hughes County District Court.
[16] "Three die in string of stabbings at understaffed prison," *Journal Record*, September 22, 2022, https://journalrecord.com/tag/davis-correctional-facility/#:~:text=Three%20die%20in%20string%20of%20stabbings%20at%20understaffed%20prison&text=At%20least%2018%20people%20have,this%20year%2C%20emergency%20records%20show
[17] *Id.*, and "18 stabbings in less than nine months at Oklahoma CoreCivic prison," Prison Legal News, March 2023. https://www.prisonlegalnews.org/news/2023/mar/1/18-stabbings-less-nine-months-oklahoma-corecivic-prison/
[18] *Id.*
[19] *Id.*

56. On February 25, 2023, Brantley Avallone was found unresponsive and covered in blood in his cell, killed by his cellmate.[20]  He died of multiple stab wounds.

57. A primary cause of all of this violence is the chronic understaffing of DCF.  Bobby Cleveland, the executive director of Oklahoma Corrections Professionals, stated that DCF's persistent staffing shortages and resulting prisoner lockdowns were evident in weekly reports. The facility was regularly on lock down because they do not have enough staff.[21] A 2021 audit of DCF found only about 70% of _contractually required_ positions were filled.[22]

58. It is not uncommon for one correctional officer to guard between 120 to 240 inmates by themselves.[23]

59. DCF Correctional Officers were informing prison administration of the existence of weapons in the prison.[24]

60. Hughes County EMS has responded to multiple calls about prison violence from homemade "shanks" including a 12-inch knife.[25]

61. DCF was also regularly housing extremely violent offenders in general population.[26]

---

[20] "Inmate dead, Wilson arrested for murder at Davis Correctional Facility," _Holdenville News_, May 15, 2023. https://www.holdenvillenews.com/news/inmate-dead-wilson-arrested-murder-davis-correctional-facility

[21] _Id._

[22] "18 stabbings in less than nine months at Oklahoma CoreCivic prison," _Prison Legal News_, March 2023.  https://www.prisonlegalnews.org/news/2023/mar/1/18-stabbings-less-nine-months-oklahoma-corecivic-prison/ (emphasis added)

[23] _Id._

[24] _Id._

[25] _Id._

[26] _Id._

62. Thus, what is known, obvious, or can be reasonably inferred from all of this history is that:

    A.    DCF regularly failed to protect inmates who had previously requested protection or had been previously assaulted;

    B.    DCF regularly kept known violent offenders in general population and failed to segregate them from those inmates needing additional protection;

    C.    Knives and other weapons were regularly made and used by inmates at DCF;

    D.    DCF routinely had staffing levels below those contractually required by the State and, thus, there were not enough correctional officers to protect inmates from each other; and

    E.    The prison administration was aware of these conditions but took inadequate action to solve any of these problems thus resulting in inmate-on-inmate violence in direct violation of inmates' constitutional rights.

### CoreCivic's Culture of Indifference and Deceit

63. It's undeniable that prisons are often inherently dangerous places. However, CoreCivic has maintained a culture of indifference that allows violence to flourish within its facilities, far exceeding national statistics. CoreCivic has repeatedly inadequately staffed its facilities, inadequately trained the employees it does staff, failed to properly document serious incidents, and failed to make any efforts to rectify the sub-par conditions that lead to routine violent acts within its prisons. When authorities have attempted to investigate violence or other misconduct at

CoreCivic facilities, CoreCivic has gone to great lengths to conceal their inadequacies, going far as to purposely falsify documents and destroy crucial evidence.

64. In 2010, the FBI began investigating CoreCivic's (Corrections Corporation of America (CCA) at the time) policies and practices following an incident in which an inmate brutally beat another inmate unconscious at the Idaho Correctional Center. A video revealed that nearby guards stood by idly, watching the vicious beating. The American Civil Liberties Union ("ACLU") filed a lawsuit in the United States Court for the District of Idaho in March 2010 that alleged that guards were failing to protect inmates from violence by other inmates. The ACLU ultimately reached a settlement with CCA in September 2011 and was awarded $349,000 in attorneys' fees. Part of the settlement agreement ordered CCA to increase staffing levels at the Idaho facility.[27]

65. In 2012, however, the Idaho Department of Corrections ("IDOC") discovered that CCA had been falsifying staffing numbers and that it was failing to comply with the settlement agreement. The investigation found that CCA had overreported a total of approximately 4800 staffing hours in 2012. In 2013, a federal judge held CCA in contempt of court for continuing to understaff the Idaho facility, in direct violation of their previous settlement.[28] CCA appealed the judge's order, and the

---

[27] "Federal judge holds Corrections Corporation of America in contempt for violating Idaho settlement agreement," September 16, 2023 https://www.aclu.org/press-releases/federal-judge-holds-corrections-corporation-america-contempt-violating-idaho

[28] *Id.*

Ninth Circuit Court of Appeals affirmed the district court's order in all respects on May 23, 2016.[29]

66. In 2016, journalist Shane Bauer obtained a job as a prison guard at Winn Correctional Center, a CORECIVIC-run facility in Winnfield, Louisiana. Bauer spent four months as a guard at Winn, and subsequently wrote a truly stunning expose that described widespread violence between inmates, abysmal medical and mental healthcare for prisoners, and virtually non-existent training for staff.[30]

67. CoreCivic has a history and business model of prioritizing profits over the safety of inmates, seriously failing in their constitutional duties.  Often, in their contracts with states, CoreCivic has an occupancy guarantee that creates clear conflicts of interest for law enforcement and prisons.  These guarantees range from 80-100% with the majority of them being 90%.[31]  In Oklahoma, the guarantee is 95 to 100%.[32]

68. In 2015, the DOC sent four "notice to cure" letters to Cimarron, then another Oklahoma facility run by CoreCivic, informing the facility that it had breached various aspects of its contract with the DOC. Two of the letters informed CoreCivic that Cimarron had sent in late, inaccurate, or incomplete reports

---

[29] "Federal appeals court upholds contempt order against Corrections Corporation of America," May 23, 2016. https://www.aclu.org/press-releases/federal-appeals-court-upholds-contempt-order-against-corrections-corporation-america
[30] Bauer, Shane, "My four months as a private prison guard," Mother Jones, July/August 2016. https://www.motherjones.com/politics/2016/06/cca-private-prisons-corrections-corporation-inmates-investigation-bauer/
[31] http://www.njjn.org/uploads/digital-library/Criminal-Lockup-Quota,-In-the-Public-Interest,-9.13.pdf
[32] *Id.*

regarding critical incidents at the facility. In October 2015, the DOC sent a third letter regarding critical incidents that stated that it had still not received critical incident reports dating back to March 2015. The fourth letter admonished Cimarron for failing to follow its internal policies regarding surveillance camera footage.[33] Further, while the DOC has the power to punish CoreCivic by issuing monetary fines, it declined to do so in connection with the four letters it sent to Cimarron in 2015.

69. CoreCivic has made great efforts to conceal as much damning evidence about the practices as possible, as evidenced, for example, by their falsification of staffing hours in Idaho detailed above. CoreCivic additionally attempted to obscure its liability and policy violations related to the September 2015 riot at Cimarron.

70. The Inspector General's Office ("IG") of the Oklahoma Department of Corrections began an investigation into the September 2015 riot shortly after it occurred.[34] Then-director of the DOC, Robert Patton, additionally organized an After-Action Review Team ("AART") to conduct its own investigation into the riot. Notably, however, is the fact that Cimarron/CORECIVIC employees comprised the majority of the eight-member AART.

71. Patton's stated goal was for the AART to investigate the incident and then make recommendations to the DOC regarding possible policy changes and/or disciplinary actions to be taken against Cimarron/CORECIVIC. It is unclear why

---

[33] https://www.kgou.org/news/2016-06-13/department-of-corrections-slow-to-address-private-prison-contract-breaches-records-show
[34] "Video surfaces in deadly 2015 Cushing prison riot," News 9, October 11, 2017. https://www.news9.com/story/5e345d623196993fcfd0527a/video-surfaces-in-deadly-2015-cushing-prison-riot

Patton thought it was necessary for the AART to conduct its own investigation independent of the IG investigation.

72. Ultimately, the IG's office completed its Administrative Report, which concluded that Cimarron/CORECIVIC employees violated at least two of their own policies and also deleted at least three different pieces of surveillance footage that captured the riot. The IG's report also recommended that at least two inmates be charged with first-degree murder. The Oklahoma Department of Corrections determined that CoreCivic employees recorded over or deleted video footage following this violent inmate attack in 2015.[35]

73. The AART report, on the other hand, did not discuss the deleted video footage and failed to note that Cimarron/CORECIVIC employees violated their "locked door" policy. The AART report was approximately six pages long and scant on detail. The AART report, however, was the only report released to the public in connection with the September 2015 riot. The DOC declined to release its own IG report or the surveillance video of the incident. CoreCivic was not penalized or sanctioned by the DOC after the investigations were concluded, and no one was ever charged with murder, despite the IG's recommendation.[36]

74. For years, CoreCivic has utterly failed to properly train and supervise the staff at its detention facilities, including DCF. Many CoreCivic facilities, including DCF, have consistently maintained severe staffing shortages that makes it impossible to run a safe and secure prison. When facilities, like DCF, are understaffed and

---

[35] *Johnson v CoreCivic et al.,* 2018 U.S.Dist. LEXIS 188887 (W.D.Tenn. 2018).
[36] *Id.*

run by untrained guards, it leads to increased risks to vulnerable inmates like Plaintiff.

75. Further, CoreCivic facilities, including DCF, have a policy, practice and/or custom of failing to train and supervise their prison employees in the following areas: conducting regular sight checks, reporting violent incidents between inmates, documenting physical altercations between inmates, taking inmate complaints seriously, preventing inmates from obtaining contraband such as illegal narcotics and makeshift weapons, properly classifying and housing inmates, providing adequate medical and mental healthcare treatment to inmates, and reporting policy violations to superiors.

76. CoreCivic is clearly on notice that their practice of understaffing and undertraining its employees, at DCF and other facilities, substantially increases the risks of inmate-on-inmate violence, as evidenced by the allegations above.

**FIRST CAUSE OF ACTION**

*42 U.S.C. §1983 Against All Defendants*
*Civil Rights Claim – 8th Amendment (Cruel & Unusual Punishment)*

For her First Cause of Action, the Plaintiff adopts and re-alleges her allegations above as if fully set forth herein and further alleges and states as follows:

77. At the time of the complained events, Plaintiff was an inmate already convicted of a crime and had a clearly established constitutional right under the Eighth Amendment to be free from cruel and unusual punishment.

78. The Eighth Amendment requires that convicted inmates like Plaintiff be offered reasonably adequate conditions of confinement. The right to be protected against

violence committed by other inmates is part of the conditions of confinement requirement afforded by the Eighth Amendment.

79. Any reasonable Prison employee knew or should have known those rights at the time of the complained-of conduct as they had been clearly established for decades.[37]

80. CoreCivic employees at DCF knew, or it was obvious, that Plaintiff due to her gender presentation was at an increased risk of injury at the hands of other inmates, and thus needed to be monitored closely. But upon information and belief, CoreCivic employees failed to monitor Plaintiff and failed to respond timely when Plaintiff was attacked. By the aforementioned acts and omissions, CoreCivic employees deprived Plaintiff of her right to be free from cruel and unusual conditions of confinement.

81. Prison employees, including DOES ##1-10, were on notice, or it was obvious, that vulnerable inmates like Plaintiff were at an excessive risk of being targeted for violence at the hands of other inmates it they were not closely monitored, as inmate-on-inmate violence is an epidemic at DCF. As discussed above, several of the other murdered inmates suffered from mental illness, had previously been assaulted by other inmates and/or had reported a fear of being assaulted by their other inmates just like the Plaintiff here.

82. Defendant DOES ##1-10's acts and/or omissions directly caused Plaintiff physical pain, severe emotional distress, mental anguish, terror and ultimately his brutal attack which left her with a permanent TBI.

---

[37] *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

### SECOND CAUSE OF ACTION
### 42 U.S.C. §1983 Against CoreCivic
### Civil Rights Claim – 8th Amendment (Cruel & Unusual Punishment)
### Municipal/"Monell" Liability Against CoreCivic

For her Second Cause of Action, the Plaintiff adopts and re-alleges her allegations above as if fully set forth herein and further alleges and states as follows:

83. CoreCivic is a "person" for purposes of 42 U.S.C. § 1983.

84. At all times pertinent hereto, CoreCivic was acting under the color of state law.

85. CoreCivic has been endowed by the Oklahoma Department of Corrections with powers or functions governmental in nature, such that CoreCivic became an instrumentality of the State and subject to its constitutional limitations.

86. CoreCivic is charged with implementing and developing the policies of the DOC with respect to the care and supervision of inmates in the custody of the DOC who are housed at DCF, and has the responsibility to adequately staff its facilities, and adequately train and supervise its employees.

87. In addition, CoreCivic implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Prison.

88. CoreCivic has maintained a custom of understaffing its detention facilities, including DCF. CoreCivic has additionally followed a practice of undertraining and/or inadequately training the staff it does employ. Upon information and belief, these training and staffing shortfalls have resulted in:  Prison guards who fail to routinely monitor inmates, including but not limited to especially vulnerable inmates that require an extra level of supervision, like Plaintiff; Prison staff who fail to properly classify and house inmates; Prison guards that fail to

respond to inmate-on-inmate violence, as happened here; Prison staff who fail to document acts of violence within the Prison and/or submit inaccurate or incomplete incident reports; Prison staff who do not report policy violations, whether it is an inmate or a Prison guard who commits the violation; Prison leadership who fail to investigate acts of violence or threats of violence; Prison leadership who fail to punish Prison staff who commit policy violations; Prison leadership who fail to report crucial investigations/reports to the DOC; Prison staff who fail to adequately search inmates for contraband and/or makeshift weapons, as one can assume occurred here; Prison staff who fail to identify an emergent medical condition; Prison staff who fail to properly treat inmates for mental illnesses; and Prison staff who fail to timely seek emergent medical treatment for inmates in need.

89. There is an affirmative causal link between the aforementioned acts and/or omissions of CoreCivic staff, as described above, in being deliberately indifferent to Plaintiff's right to adequate protection while in confinement, and the above-described customs, policies and/or practices carried out by CoreCivic.

90. CoreCivic knew or should have known, either through actual or constructive knowledge or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Plaintiff. By fostering the aforementioned policies, practices and/or customs, CoreCivic has created an environment in which vulnerable inmates like Plaintiff are exposed to an increased risk of violence. Nevertheless, CoreCivic failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Plaintiff's, rights to be from inmate-on-inmate violence.

91. CoreCivic tacitly encouraged, ratified and/or approved of the acts and/or omissions alleged herein.

92. There is an affirmative causal link between the aforementioned customs, policies and/or practices and Plaintiff's injuries and damages as alleged herein.

### THIRD CAUSE OF ACTION
### 42 U.S.C. §1983

### Supervisory Liability Against Warden James Yates, in his individual capacity

For her Third Cause of Action, the Plaintiff adopts and re-alleges his allegations above as if fully set forth herein and further alleges and states as follows:

1. There is an affirmative link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Plaintiff's Eighth Amendment rights and policies, practices and/or customs that Warden Yates promulgated, created, implemented and/or possessed responsibility for. Such policies, practices, and/or customs, include, but are not limited to:

   a. Understaffing;

   b. Nonexistent or inadequate training of Prison guards;

   c. A failure to document and properly report critical incidents, including incidents involving inmate-on-inmate violence;

   d. A nonexistent or inadequate internal investigation policy;

   e. A practice of withholding and/or destroying evidence relevant to critical incident investigations;

   f. A custom of failing to report employee policy violations;

   g. A custom of failing to discipline employees who commit policy violations;

h. A custom of failing to adequately supervise inmates, including inmates with heightened vulnerability; and

i. A custom of ignoring inmate complaints and/or threats of violence.

93. Warden Yates knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Plaintiff.

94. Warden Yates disregarded the known and/or obvious risks to the health and safety of inmates like Plaintiff.

95. Warden Yates, through his continued encouragement, ratification and approval of the aforementioned policies, practices and/or customs, in spite of their known and/or obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Plaintiff's, constitutional rights.

96. There is an affirmative link between the unconstitutional acts of his subordinates and Warden Yates' adoption and/or maintenance of the aforementioned policies, practices and/or customs.

97. As a direct and proximate result of the aforementioned policies, practices and/or customs, Plaintiff suffered injuries and damages as alleged herein.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Defendants Created or Enhanced the Danger to Plaintiff from Third Party Actors**

For her Fourth Cause of Action, the Plaintiff adopts and re-alleges her allegations above as if fully set forth herein and further alleges and states as follows:

98. At all times herein, the Plaintiff was under the control of the State of Oklahoma, as delegated to CoreCivic, and had been since she was taken into custody.

99. Drew was a member of a limited and specifically definable group, namely a DCF inmate who was at known enhanced risk of attack.

100.    Drew had reported to Defendants that she had concern for her physical safety from other inmates because of her gender presentation. Among other threats, Drew had been asked by Mr. Barrett and Mr. Wainscott to participate in drug transfers inside the prison, but Drew refused.

101.    Despite these facts, Defendants placed Drew in the yard with the two specific inmates who had previously threatened him.

102.    With 18 stabbings in nine months, it should have been abundantly obvious to Defendants that cutting implements were readily available to inmates.

103.    Rather than supervise this recreation time, Drew was left completely unprotected. She was prohibited from having any implement with which to defend herself. She had no ability to run away from these murderers.

104.    Correctional Officer Scott walked away from her post for an extended period of time, allowing Barrett and Wainscott to attack the Plaintiff.

105.    Prison administrators, including Warden Yates, failed to ensure there was supervision over the inmates in that they did not have a correctional officer observing the inmates.

106.    Defendants allowed this lack of supervision to continue long enough to allow two inmates to get out of their cages, crawl on top of Plaintiff's cage, cut Plaintiff's cage open, nearly kill the Plaintiff, and then be left unseen for an hour.

107.    Defendants' conduct put Plaintiff at substantial risk of serious, immediate and proximate harm

108.     The risk to Drew was known to Defendants and/or should have been obvious given the facts stated herein.

109.     Defendants acted recklessly in conscious disregard of that risk.

110.     The Defendants' conduct when viewed in total is conscience-shocking.

111.     Defendants, acting under the color of state law, placed Drew in a position of additional danger she otherwise would not have been in.

112.     Defendants' deprivation of the Plaintiff's federal rights as described above is willful, wanton and malicious entitling Plaintiff to punitive damages against the Defendants.

### FIFTH CAUSE OF ACTION
### Negligence Against All Defendants

For her Fifth Cause of Action, the Plaintiff adopts and re-alleges all of her allegations above as if fully set forth herein and further allege and state as follows:

113.     The Defendants owed Plaintiff a duty of ordinary care to ensure her safety while they had her in confinement.

114.     Defendants had knowledge of Plaintiff's vulnerabilities.

115.     Defendants had knowledge of Inmates Barrett and Wainscott's history of violence.

116.     Defendants knew or should have known that Plaintiff had requested protection due to her fears for her safety.

117.     Despite this duty and this knowledge, Defendants failed to protect the Plaintiff by either failing to supervise the "rec" yard or failing to direct appropriate supervision given the circumstances.

1.    Defendants breached the duties they owed to the Plaintiff in multiple ways. Defendants failed to implement reasonable safeguards to:

    a.   Take action to prevent inmate-on-inmate violence;

    b.   Train and supervise detention staff so as to prevent inmate-on-inmate violence; and

    c.   Adequately staff DCF so as to provide appropriate supervision over inmates.

118.    Any or all of Defendants' failures described above were substantial contributing factors for some of Plaintiff damages, as set out more fully below.

## DAMAGES FOR ALL CLAIMS

The Plaintiff adopts and re-alleges all of her allegations above as if fully set forth herein and further allege and state as follows:

119.    Due to Defendants' actions as described above, Plaintiff was grievously injured.

120.    Drew was taken by ground ambulance to a medi-flight. She was intubated in the ambulance.

121.    The medi-flight took Drew to OU Medical Center for a higher level of care.

122.    The Plaintiff was treated at OU Medical Center for multiple face lacerations, traumatic encephalopathy, traumatic injury of head with hematoma of scalp. Plaintiff remained in ICU for 9 days unresponsive and on a ventilator.

123.    Drew remained in a coma for approximately seven months. Despite being comatose, Drew was shackled to his bed.

124.    Around September 11, 2022, Drew began to awake from her coma.

125.    Drew was then moved to Lindsey Memorial Hospital for continued care. She received treatment for severe traumatic brain injury with severe cognitive and neurological impairment and left-sided paralysis, chronic left shoulder dislocation and other ailments.

126.    Plaintiff was released from Lindsay Municipal Hospital October 24, 2022, eight months after being transferred from OU Medical Center. Doctors believed she would never recover to any meaningful state. Drew was then transferred to North Winds Living Center.

127.    Drew is now at Northwind Living Center where she requires round the clock care. She cannot bathe, eat, toilet or transport herself with medical devices or the assistance of another person. She is tube-fed and permanently paralyzed on the left side of her body. While Drew may continue to improve, it is anticipated that she will never be returned to the state of health she was in when she was admitted into the Department of Corrections care.

128.    Pursuant to the general rules of pleading, 12 O.S. § 2008, Plaintiff asserts that the amount sough as damages for claims set forth herein is in excess of seventy-five thousand dollars ($75,000).

129.     Plaintiff is making claims for damages including, but not limited to, the following:

    A.     Her physical pain and suffering, past and future;

    B.     Her mental pain and suffering, past and future;

    C.     Her impairment;

    D.     Her disfigurement;

    E.     Loss of earnings; and

    F.     Reasonable expenses of necessary medical care, treatment, and services, past and future.

## PUNITIVE DAMAGES

The Plaintiff adopts and re-alleges all of her allegations above as if fully set forth herein and further allege and state as follows:

130.     Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendant's conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Plaintiff's federally protected rights.

WHEREFORE, based on the foregoing, Plaintiff respectfully requests this Court grant relief sought, including but not limited to actual and compensatory damages and punitive in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorney's fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

_/s/A. Laurie Koller_
Laurie Koller, OBA #16857
Ashley Leavitt, OBA #32818
Koller Trial Law, PLLC
2504 E. 21 St., Suite B
Tulsa, OK 74114
(918)216-9596-office
(918)248-8238-fax
laurie@kollertriallaw.com
ashley@kollertriallaw.com

And

Jim Buxton, OBA #19057
Buxton Law Group
511 Couch Drive, Suite 300
Oklahoma City, OK 73102
(405)604-5577-office
(405)604-5578-fax
jim@buxtonlawgroup.com
**_Counsel for Plaintiffs_**